# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BEVERLY ANN KOCEVAR,

        Defendant-Appellant.

UNPUBLISHED
March 16, 2017

No. 329150
Manistee Circuit Court
LC No. 15-004470-FH

Before: RONAYNE KRAUSE, P.J., and O'CONNELL and GLEICHER, JJ.

PER CURIAM.

A Michigan State Police trooper stopped defendant Beverly Kocevar's vehicle after observing the front passenger tire cross the right fog line. The trooper expeditiously established that Kocevar was lost and not impaired, but nevertheless questioned Kocevar regarding whether "she had anything in the car that she shouldn't have." After the trooper threatened to bring a "drug dog" to the scene, Kocevar consented to a search. The trooper found a pill bottle containing methadone that did not belong to Kocevar.

Kocevar moved to suppress the methadone, contending that her consent to the search was involuntary. The trial court agreed, but ruled that the inevitable discovery doctrine "justifie[d] the search." The court rested this ruling on Kocevar's admission that her medical marijuana (for which she had a card) was in the back seat rather than in the trunk. A jury convicted Kocevar of unlawful possession of less than 25 grams of a controlled substance (methadone), MCL 333.7403(2)(a)(*v*).

Kocevar now challenges the seizure on Fourth Amendment grounds. To satisfy the inevitable discovery doctrine, the prosecution must demonstrate that the trooper would have found the methadone by lawful means. The prosecution cannot sustain that burden here, as the trooper unconstitutionally prolonged Kocevar's detention to ferret out evidence of criminal wrongdoing. Authority for Kocevar's seizure expired when the trooper completed the traffic stop mission—well before the prolonged questioning about what Kocevar had in her car. Because the trooper lacked any articulable suspicion of criminal activity to extend the stop absent Kocevar's tainted consent, we reverse Kocevar's conviction.

-1-

## I. FACTS AND PROCEEDINGS

While on routine patrol and heading westbound on M-55, Michigan State Police Trooper Kathleen Wicker observed the front passenger tire of Kocevar's eastbound vehicle momentarily cross the fog line.[1] Wicker turned around and effectuated a traffic stop. At an evidentiary hearing she explained the reason for the stop: "Based on my training and experience, when people cross the fog line or don't keep within their lane of travel, it indicates they could be intoxicated." Wicker admitted that nothing other than the brief fog line incursion had drawn her attention to Kocevar's vehicle. Trooper Wicker exited her car, explained the reason for the stop, and obtained Kocevar's license and registration. Kocevar "immediately" volunteered that "she was lost, that she was trying to take the back way from Interlochen to the Hoxeyville Music Festival." Wicker quizzed Kocevar about what she might have in her car:

> *A.* I began to tell her the way to get there, but I also asked, as I typically do, if she had anything in the car that she shouldn't have.
>
> *Q.* Why do you typically ask that question?
>
> *A.* I ask that to - - some people will tell me I've got a bottle of wine or something in the vehicle. Sometimes it's no, I don't think so. You can gauge someone's response, their truthfulness.

Kocevar denied having anything in the vehicle other than her six-year-old daughter. Wicker brought Kocevar's driver's license to her patrol car and ran the information through the "in-car computer." The computer revealed that Kocevar had been convicted of a drug offense 11 years earlier, and had no outstanding warrants. Wicker found this information significant, as (in her words): "somebody with a prior drug crime might have more drugs with them." Wicker's testimony continued:

> *Q.* And with this knowledge, what was your next action?
>
> *A.* I returned to the vehicle and I asked her if she was sure that she didn't have anything in the vehicle she should not have.
>
> *Q.* Did she respond to you in the same manner or was it different this time?
>
> *A.* I don't exactly remember how she responded, but her response made me think that maybe there was something.

After refreshing her memory of the stop with her report, Trooper Wicker recounted:

---

[1] A fog line marks the right edge of the drivable portion of a divided road.

*A.* When I asked her if she had anything in the car that she shouldn't have, she again replied no. I asked her if I could search it. She responded by asking if I needed a search warrant.

*Q.* And what was your response to her inquiry?

*A.* I said I didn't need a search warrant if she gave me consent to search.

According to Kocevar, Wicker declared "she could get a dog," which Kocevar interpreted as: "they were going to search my car regardless of consent." Wicker recalled that after the conversation turned to a search of the car, Kocevar revealed that she possessed medical marijuana and a valid medical marijuana card. When Kocevar attempted to reach into the backseat Wicker instructed her not to do so, as "when she reached towards the backseat of the car, to me that indicated the marijuana was in that bag which was indicative of improper transport of marijuana." The colloquy continued:

*Q.* . . . [A]t that point what did you do, if anything?

*A.* I told her to stop, not to reach for the bag . . . .

\* \* \*

*Q.* At that point what happened next?

*A.* . . . I said that if all she had, I believe, was the marijuana that - - and she had a marijuana card, it should be okay. She then gave me consent to search.

The search yielded a prescription bottle of methadone that did not belong to Kocevar. Wicker also found Kocevar's medical marijuana, which was later returned to Kocevar.

On cross-examination, Wicker conceded that other than the fact of Kocevar's 2004 conviction, she had no reason to suspect that any drug crime was afoot. She also admitted that she had never issued any driver "an actual citation" for driving on or crossing the fog line, and usually dispensed only a verbal warning. True to that tradition, no fog line citation was issued here.

Kocevar filed a motion to suppress the methadone, contending that her consent to the search was involuntary and that Wicker otherwise lacked reasonable suspicion of contraband in the car. The prosecutor argued that Kocevar's consent was freely given, but alternatively posited that discovery of the methadone was "inevitable" as Kocevar had admitted to transporting medical marijuana in the passenger compartment of her car. According to the prosecutor, this act constituted a misdemeanor under MCL 750.474. Given that Wicker could have arrested Kocevar on the spot for illegal transport of the marijuana, the prosecutor urged, the methadone would have been found in a subsequent inventory search.

During the evidentiary hearing, Wicker revealed that the encounter had been recorded on a DVD that began recording 30 seconds before Wicker stopped Kocevar's car. Judge David A. Thompson described the video as "grainy" and noted that he could not see Kocevar's "rear

-3-

wheel." Nevertheless, Judge Thompson determined that Kocevar's "front passenger side wheel" and "passenger side . . . cross[ed] over the fog line." Judge Thompson further observed that "there does not appear to be any weather that would've caused someone to favor the fog line," as the day was "clear" and "warm."

Judge Thompson acknowledged that his predecessor on the circuit court, Judge James Batzer, had ruled in a different case that driving "partially over the fog line" did not constitute a violation of MCL 257.642. Judge Thompson disagreed with Judge Batzer, invoking an unpublished opinion of this Court.[2] In Judge Thompson's view, Wicker "had reasonable suspicion" that a violation of MCL 257.642(1)(a) had occurred, which justified the stop. The court was not convinced, however, that Kocevar had voluntarily consented to the search of her vehicle:

> Now, this Court has serious reservations as to whether or not the consent in this instance was valid by the defendant. The timing is such that this defendant was detained for approximately ten minutes before it appears on the video that she finally acquiesced and granted the trooper consent to search the vehicle. During that time, as Trooper Wicker indicated, it was warm, quite warm. She had a young child in her car. There seems to have been some dialogue back and forth as elicited by Mr. Becker during his cross-examination of Trooper Wicker in which consent was asked for three times and denied three times.

> * * *

> Consent has to be unequivocal. It has to be clear that the individual has consented. And it has to be freely given. What led up to this, this Court finds from looking at the totality of the circumstances, was persistence by Trooper Wicker to attempt to access the car. And ultimately she was successful and located contraband, specifically the methadone. . . . The Court cannot find that this defendant, though, provided valid consent to search the vehicle.

Nevertheless, Judge Thompson declined to suppress the methadone. The court adopted the prosecutor's argument that because Kocevar was not carrying her medical marijuana "in a trunk as was required by Michigan law," Wicker could have arrested her for a misdemeanor violation of the Michigan Medical Marijuana Act. "Whether she did that or not," the court declared, a search would have been conducted. A jury convicted Kocevar of unlawful possession of a controlled substance, and she now appeals.

---

[2] *People v Boyd*, unpublished opinion per curiam of the Court of Appeals, issued April 20, 2010 (Docket No. 289045). Without elaboration, the *Boyd* panel stated that the traffic stop in that case "was lawful because driving outside a traffic lane constituted a traffic violation."

## II. STANDARD OF REVIEW

We review de novo a trial court's ruling on a suppression motion, *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011), its interpretation of a statute, *People v Droog*, 282 Mich App 68, 70; 761 NW2d 822 (2009), and its application of Fourth Amendment principles. *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). Factual findings made by the court are reviewed for clear error, with deference given to the trial court's resolution of factual issues. *People v Frohriep*, 247 Mich App 692, 702; 637 NW2d 562 (2001). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993). "We overstep our review function if we substitute our judgment for that of the trial court and make independent findings." *Frohriep*, 247 Mich App at 702.

## III. FOURTH AMENDMENT PRINCIPLES

Kocevar contends that the seizure of her vehicle contravened the Fourth Amendment, as her brief incursion over the fog line did not supply reasonable suspicion for the traffic stop. We consider this a close question. Ultimately, however, we need not answer it, as the trial court incorrectly relied on the inevitable discovery doctrine to uphold the search. The prolonged seizure of Kocevar's vehicle clearly contravened a long line of United States Supreme Court cases, beginning with *Florida v Royer*, 460 US 491, 500; 103 S Ct 1319; 75 L Ed 2d 229 (1983) ("This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."), followed by *Illinois v Caballes*, 543 US 405, 407; 125 S Ct 834; 160 L Ed 2d 842 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."), and culminating in *Rodriguez v United States*, __ US __; 135 S Ct 1609, 1616; 191 L Ed 2d 492 (2015).

We begin with the familiar principles that guide our Fourth Amendment jurisprudence regarding traffic stops. "[T]o effectuate a valid traffic stop, a police officer must have an articulable and reasonable suspicion that a vehicle or one of its occupants is subject to seizure for a violation of law." *People v Williams*, 236 Mich App 610, 612; 601 NW2d 138 (1999). If a driver violates a portion of the Michigan Vehicle Code in a manner constituting a civil infraction, the officer may stop and detain the vehicle. *People v Dunbar*, 499 Mich 60, 66; 879 NW2d 229 (2016). Stopping a vehicle and detaining its occupants constitutes a "seizure" under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v Prouse*, 440 US 648, 653; 99 S Ct 1391; 59 L Ed 2d 660 (1979). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 US at 500.

Wicker stopped Kocevar because she believed Kocevar violated MCL 257.642(1)(a), which provides in relevant part:

> When a roadway has been divided into 2 or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a

single lane and shall not be moved from the lane until the operator has first ascertained that the movement can be made with safety.

MCL 257.642(3) states: "A person who violates this section is responsible for a civil infraction."

This case involves not only a seizure, but also a search. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967) (citations omitted).[3] In the vehicle-search context, the exceptions generally "ensure that officers may search a vehicle when genuine safety or evidentiary concerns encountered during the arrest of a vehicle's recent occupant justify a search." *Arizona v Gant*, 556 US 332, 347; 129 S Ct 1710; 173 L Ed 2d 485 (2009). *Gant* highlighted that absent a contemporaneous arrest, the police may not rummage through a driver's personal effects simply because the driver has violated a traffic law:

> It is particularly significant that *Belton*[4] searches authorize police officers to search not just the passenger compartment but every purse, briefcase, or other container within that space. A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals. Indeed, the character of that threat implicates the central concern underlying the Fourth Amendment—the concern about giving police officers unbridled discretion to rummage at will among a person's private effects. [*Id*. at 345.]

A driver may also consent to a search. "Fourth Amendment rights may be waived, and one may always consent to a search of himself or his premises." *People v Goforth*, 222 Mich App 306, 309; 564 NW2d 526 (1997). "Consent [to search] is not voluntary if it is the result of coercion or duress." *People v Bolduc*, 263 Mich App 430, 440; 688 NW2d 316 (2004).

---

[3] Of course, where there is probable cause to search a vehicle "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." *United States v Ross,* 456 US 798, 809; 102 S Ct 2157; 72 L Ed 2d 572 (1982).

[4] *New York v Belton*, 453 US 454; 101 S Ct 2860; 69 L Ed 2d 768 (1981), "held that police may search the passenger compartment of a vehicle and any containers therein as a contemporaneous incident of an arrest of the vehicle's recent occupant." *Gant*, 556 US at 337. The Court clarified in *Gant* that *Belton* "authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id*. at 343.

## IV. FOG LINE JURISPRUDENCE

Federal and state courts from many jurisdictions have considered whether a brief fog line incursion justifies a traffic stop. The statutes at issue in these cases vary only minimally from Michigan's; they generally provide that a vehicle "shall be operated as nearly as practicable within a single lane," and may not be moved from that lane until the driver has ascertained that it is safe to do so.[5]

In a host of cases, appellate courts have held that momentary or isolated incursions on or over the fog line do not constitute a failure to keep a vehicle "as nearly as practicable entirely within a single lane." For example, in *United States v Freeman*, 209 F3d 464 (CA 6, 2000), the United States Court of Appeals for the Sixth Circuit construed a Tennessee statute identical to Michigan's in relevant part. An officer stopped the defendant's vehicle, a Winnebago motor home, because it had crossed the fog line and remained across the line for about 20 to 30 feet. *Id*. at 465. Acknowledging that an officer may conduct a stop based on probable cause to believe a traffic violation occurred, the Sixth Circuit rejected that "one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane 'as nearly as practicable.' " *Id*. at 466 (citation omitted). The court held that the officer's "observation of the motor home briefly entering the emergency lane is insufficient to give rise to probable cause of a traffic violation and warrant an invasion of [the defendants'] Fourth Amendment rights." *Id.* Citing *United States v Gregory*, 79 F3d 973, 978-979 (CA 10, 1996), the Sixth Circuit reasoned: "[i]f failure follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." *Id*.

The United States Court of Appeals for the Ninth Circuit reached a similar conclusion in *United States v Colin*, 314 F3d 439, 443 (CA 9, 2002), involving a California statute mandating that "[a] vehicle shall be driven as nearly as practical entirely within a single lane. . . ." The defendant's car "*touched* for approximately ten seconds, but *did not cross*, the fog line and the solid yellow-painted line." *Id*. at 444 (emphasis in original). Even assuming that part of the vehicle crossed the line, the Ninth Circuit concluded that the officer lacked reasonable suspicion to pull over the car: "Touching a dividing line, even if a small portion of the body of the car veers into a neighboring lane, satisfies the statute's requirement that a driver drive as '*nearly as practical* entirely within a single lane.' " *Id*. (emphasis in original).

---

[5] Our research reveals that 17 state statutes, including MCL 257.642, use the term "as nearly as practicable." The statutes of eight states use the term "as nearly as practical." *Webster's New World College Dictionary* (5th ed), p 1144, defines "practical" as "usable; workable, useful and sensible" and "practicable" as "that can be done or put into practice; feasible." *Webster's* considers the two words synonyms, explaining: "**practical** stresses effectiveness as tested by actual experience or as measured by a completely realistic approach to life or the particular circumstances involved; **practicable** is used of something that appears to be capable of being put into effect, but has not yet been developed or tried. . . ." *Id*.

Many state courts have similarly concluded that minimal fog line incursions do not justify a traffic stop. In *Rowe v State*, 363 Md 424, 427; 769 A2d 879 (2001), the defendant's car crossed the fog line "by about 8 inches," returned to travel lane, and a short time later touched the fog line again. Maryland's statute requires that vehicles "be driven as nearly as practicable entirely within a single lane." The Maryland Court of Appeals reviewed a number of state court cases construing "essentially identical statutes," *id*. at 436, including decisions from Florida, Montana, Texas, Ohio and Oregon. *Id*. at 436-440. The court concluded that a driver's "momentary crossing of the edge line of the roadway and later touching of that line" did not violate the Maryland statute, and did not support the traffic stop conducted in that case. *Id*. at 441.

In the years since *Rowe* was decided, other state courts have weighed in. The Washington Court of Appeals, construing that state's lane-travel statute (again, essentially identical to Michigan's) held that brief crossings of the fog line did not "justify a belief that the vehicle was operated unlawfully." *State v Prado*, 145 Wn App 646, 649; 186 P3d 1186 (2008). And in *State v Marx*, 289 Kan 657, 664; 215 P3d 601 (2009), the Kansas Supreme Court held that a deputy's observation that a motor home crossed the fog line, overcorrected and then crossed the centerline did not suffice to establish reasonable suspicion that the driver had violated the Kansas statute, which includes language almost identical to Michigan's. The court held that the phrase "as nearly as practicable" "tells us that a violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach." *Id*. at 675.

Some caselaw goes the other way. For example, in *State v Smith*, 484 SW3d 393, 408 (Tenn, 2016), the Tennessee Supreme Court held that a violation of the Tennessee statute (which also uses the phrase "as nearly as practicable") permits a traffic stop when an officer determines that it was "practicable" for the driver to remain in his or her lane of travel. The Court explained that " 'as nearly as practicable' means that a motorist must not leave her lane of travel any more than is made necessary by the circumstance requiring the lane excursion." *Id*. at 409. In cases where an officer "would have to investigate further whether in order to determine whether the driving maneuver violated" the statute, an officer "would not have probable cause to stop the motorist but might have sufficient reasonable suspicion to do so." *Id*. at 410. "[R]easonable suspicion," the court reminded, "will support only a brief, investigatory stop." *Id.*

Because the road on which Kocevar traveled appears relatively straight and the driving conditions favorable, we will assume that Wicker had a reasonable suspicion that Kocevar had violated MCL 257.642(3) when she effected a traffic stop. However, that is only the beginning of our analysis.

Issuing a citation for a traffic infraction does not authorize an officer to search a car. *Knowles v Iowa*, 525 US 113, 114; 119 S Ct 484; 142 L Ed 2d 492 (1998). Nor does knowledge that the person stopped has a prior drug crime on her record. *United States v Sandoval*, 29 F3d 537, 542 (CA 10, 1994). See also *State v Grayson*, 336 SW3d 138, 146 (Mo, 2011) (collecting cases).

Here, the prosecutor initially justified the search based on Kocevar's consent. The trial court found Kocevar's consent involuntary, and we have no reason to disturb that finding. See *Florida v Bostick*, 501 US 429, 435; 111 S Ct 2382; 115 L Ed 2d 389 (1991) (noting that officers

may seek consent to search "as long as the police do not convey a message that compliance with their requests is required."). The sole remaining justification for the search—the inevitable discovery doctrine—cannot be sustained, as but for a constitutional violation, the methadone would not have been found.

## V. AN UNDULY PROLONGED SEIZURE

If Wicker's initial decision to seize Kocevar by stopping her vehicle was lawful, "[i]t is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Caballes*, 543 US at 407. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*. In *Rodriguez*, 135 S Ct 1609, the United States Supreme Court shed further light on what constitutes an unconstitutional extension of a routine traffic stop.

Dennys Rodriguez was stopped when he "veer[ed] slowly onto the shoulder" of a Nebraska highway for a second or two, then "jerk[ed] back onto the road." *Id*. at 1612.[6] Trooper Struble, who accomplished the stop, was a K-9 officer and had his dog in the car. After Struble gathered Rodriguez's license, registration, and proof of insurance, Struble ran a records check on Rodriguez. *Id*. at 1613. When that was completed, Struble returned to the vehicle and asked for Rodriguez's passenger's driver's license. Struble began to question the passenger about "where the two men were coming from and where they were going." *Id*. The passenger explained that the men had traveled to look at a car that was for sale, and were returning at the time of the stop. Struble returned to his vehicle and ran a records check on the passenger. He also called for a second officer. *Id*.

Those tasks completed, Struble returned to the vehicle for a third time "to issue [a] written warning" to Rodriguez for the traffic violation. *Id*. Struble handed the licenses back to each man. At that point, Struble later conceded, he had " 'all the reason[s] for the stop out of the way[,] . . . took care of all the business.' " *Id*. (alterations in original). Nonetheless, Struble asked Rodriguez for permission to walk his dog around the vehicle, and Rodriguez said no. *Id*. Struble ordered Rodriguez to exit the vehicle and to stand in front of the patrol car until the second officer arrived. At that point, Struble "retrieved his dog," which alerted to the presence of drugs. *Id*. "All told, seven or eight minutes had elapsed from the time Struble issued the written warning until the dog indicated the presence of drugs." *Id*. The ensuing search yielded "a large bag of methamphetamine." *Id*.

A district court magistrate found no probable cause to search the vehicle apart from the dog sniff, but concluded that the seven-to-eight minute extension of the stop was "only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible." *Id*. at 1613. The United States Court of Appeals for the Eighth Circuit affirmed, holding that the

---

[6] The statutory authority for the stop, Neb Rev Stat § 60-6, 142 (2010), prohibits driving on the shoulders of highways.

delay constituted an acceptable *de minimis* intrusion. *United States v Rodriguez*, 741 F3d 905, 907-908 (CA 8, 2014).

The Supreme Court vacated the judgment, holding that the authority for Rodriguez's seizure ended "when tasks tied to the traffic infraction [were]—or reasonably should have been—completed. *Rodriguez*, 135 S Ct at 1614. "Because addressing the infraction is the purpose of the stop," the Court explained, "it may last no longer than is necessary to effectuate that purpose." *Id*. (quotation marks and citation omitted). Particularly pertinent here is the Supreme Court's further observation that the seizure of a motorist "remains lawful only so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Id*. (quotation marks and citation omitted, alteration in original). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 1615.

The Court acknowledged that "[b]eyond determining whether to issue a traffic ticket," an officer may engage a driver in "ordinary inquiries incident to . . . [the] stop." *Id*. (quotation marks and citation omitted).

> Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. [*Id*. (citations omitted).]

"[A] dog sniff," the Court emphasized, "is not fairly characterized as part of the officer's traffic mission." *Id*. Nor is investigation into "other crimes," which "detours from that mission." *Id*. at 1616. The Court was careful to distinguish between precautions taken by an officer to insure his or her safety, and garden-variety sleuthing about matters unrelated to the stop. "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id*. Nor can an officer earn "bonus time" by completing a stop without unnecessary delay. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' that point is 'unlawful.' " *Id*. (citations omitted, alteration in original). The "critical question," the Court summarized, was "whether conducting the sniff 'prolong[ed]'—i.e. add[ed] time to—'the stop.' " *Id*. Because the Eighth Circuit failed to consider whether the magistrate had correctly determined that the dog sniff "was not independently supported by individualized suspicion," the Supreme Court remanded the matter for the completion of that task. *Id*.

In *Rodriguez*, the Supreme Court trained its focus on the "mission" of a traffic stop: issuing a traffic ticket. Indeed, the Court considered the officer's traffic enforcement "mission" so critical to its analysis that it repeated this word eight times in its opinion. *Id*. at 1614-1616. Snooping around for other crimes, the Court emphasized, is not a part of the traffic stop "mission." *Id*. We follow the Supreme Court's lead, and turn to the "mission" in the case before us and the time line of its accomplishment.

Wicker testified that her initial conversation with Kocevar included an explanation of the reason for the stop and a request for Kocevar's license and registration. The video of the encounter indicates that this occurred approximately one-and-a-half minutes after Kocevar pulled her car to a stop at the side of the road. Wicker recalled having asked Kocevar during this conversation whether Kocevar "had anything in the car that she shouldn't have," and that Kocevar answered in the negative. At that point, Wicker recounted, she took Kocevar's documents to her patrol car and ran the information through her computer. Wicker learned of Kocevar's 11-year-old drug conviction, and returned to Kocevar's car. The video reflects that Wicker approached the driver's side window approximately five minutes after she had collected Kocevar's driver's license. A moment or two later, apparently in compliance with Wicker's order, Kocevar pulled her car further over to the side of the road a few yards ahead of where she had stopped, resting it completely on the shoulder.

Less than half a minute later, Wicker again engaged Kocevar in conversation. Wicker did not return Kocevar's documents. During this conversation, Wicker recollected, Kocevar's responses indicated to Wicker that "maybe there was something" in the car. Wicker testified that she again asked Kocevar if "she had anything in the car that she shouldn't have," and Kocevar repeated that she did not. At some point during the conversation, Kocevar's possession of a medical marijuana card came up; when Kocevar reached toward the back seat Wicker instructed her not to, stating (in Wicker's words) that "if she had . . . a marijuana card, it should be okay[.]"

All told, the trial court found that Wicker asked for consent to search three times, and Kocevar denied permission three times. When Wicker again asked to search the vehicle, Kocevar inquired whether a search warrant was required. Wicker replied that she did not need a search warrant. Kocevar recalled that Wicker also advised "she could get a dog." Kocevar then consented to a search. The trial court found that Wicker had detained Kocevar for approximately 10 minutes in total before commencing the search. And in her preliminary examination testimony, Wicker admitted that she and Kocevar had "a somewhat protracted conversation about searching [Kocevar's] car."

The "mission" of the traffic stop was to ticket Kocevar for her fog line infraction. Although Wicker candidly admitted that she has never given anyone a citation for driving on or crossing the fog line and did not cite Kocevar for this offense, no other reason justified stopping Kocevar's car. The traffic-control portion of the "mission" was complete when Wicker returned to Kocevar's car after running Kocevar's information through the computer. That was the point at which Wicker was authorized either to ticket Kocevar or to send her on her way with a warning. Instead, Wicker pivoted from traffic enforcer to drug detective. In so doing, Wicker violated Kocevar's Fourth Amendment right to be free from unreasonable seizure.

## VI. THE INEVITABLE DISCOVERY DOCTRINE DOES NOT APPLY

The inevitable discovery doctrine permits the admission of evidence obtained in violation of the Fourth Amendment if a preponderance of the evidence demonstrates that the contraband eventually would have been obtained in a constitutionally acceptable manner. *People v Hyde*, 285 Mich App 428, 439; 775 NW2d 833 (2009). *Hyde* requires that a court examine the following factors: (1) whether the legal means that would have led to the discovery of the evidence are truly independent, (2) "whether both the use of the legal means and the discovery

-11-

by that means are truly inevitable, and (3) whether the application of the inevitable discovery doctrine provides an incentive for police misconduct or significantly weakens Fourth Amendment protections." *Id*. at 440.

The trial court ruled that Wicker would have inevitably discovered the methadone because during her conversation with Kocevar regarding a search, Kocevar volunteered that she had medical marijuana in the passenger compartment. According to the trial court, transporting medical marijuana in an accessible location in the vehicle violated Michigan law.[7] However, Kocevar's revelation was made during an unconstitutionally protracted seizure. But for the questioning that persisted far beyond the time needed to ticket or warn Kocevar about her driving, Wicker would never have learned about the medical marijuana or threatened the dog sniff that led to Kocevar's involuntary consent. Application of the inevitable discovery doctrine under these circumstances would incentivize conduct that *Rodriguez* and its predecessors condemn: prolonging a seizure for the sole purpose of ferreting out an unrelated crime. Just as Wicker's inaccurate statements about the need for a search warrant tainted Kocevar's consent, her extended questioning about what Kocevar might be carrying in the car poisoned Kocevar's revelation about the presence of her medical marijuana.

We reverse.

/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher

---

[7] This Court subsequently held that the statute on which the trial court relied, MCL 750.474, cannot be enforced against an otherwise compliant medical marijuana patient. *People v Latz*, __ Mich App __; __ NW2d __ (2016) (Docket No. 328274, issued December 20, 2016).